Louis P. GUIDA

v.

UNDERWRITERS AT LLOYD'S
Subscribing to Policy Nos.
13/711/79 and 13/774/79

and

Barry Epstein Rhulen Agency, Inc.

and

The Zinman Group.

Civ. No. 80–4357.

United States District Court,
E.D. Pennsylvania.

March 4, 1983.

Paul M. Lewis, Sarner, Borofsky & Stein, Philadelphia, Pa., for Barry Epstein.

Daniel J. Ryan, LaBrum & Doak, Philadelphia, Pa., for Rhulen Agency, Inc.

G. Wayne Renneisen, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, Pa., for Zinman Group.

Patrick J. O'Connor, Miles A. Jellinek, Cozen, Begier & O'Connor, Philadelphia, Pa., for plaintiff.

James Lewis Griffith, Griffith & Burr, P.C., Philadelphia, Pa., Alan M. Kramer, New York City, for defendant—Underwriters at Lloyd's.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

On August 17, 1978, the plaintiff, Louis Guida, entered into an agreement with the defendant Barry Epstein ("Epstein"), Cynthia, Irving and Joanne Epstein to purchase a 25% interest[1] in a Standardbred horse

---

1. This interest represents 10 shares in Sonsam. Guida sold 5 shares on May 1, 1979 and 3 shares on November 15, 1981, November 23, 1981 and January 22, 1982 respectively. Plaintiff's Answers and Supplemental Answers to Defendant Underwriters' Interrogatories No. 11(e). It appears plaintiff has also sold the remaining 2 shares. See Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, at 15.

named Sonsam, a proven winner as a pacer at the track. Because it was the intention of the parties to this agreement [2] that Sonsam would eventually stand at stud, they made the agreement "conditioned upon SONSAM satisfactorily passing a comprehensive stallion fertility test to be conducted ... under the supervision of a panel of veterinarians ...." The agreement further provided that if Sonsam failed to pass the fertility test, "all moneys and payments made are to be returned to the respective parties ... as if this agreement never existed." [3]

Guida also hedged his bet by seeking insurance against the risk that Sonsam would fail the fertility test. He first contacted the defendant, the Rhulen Agency ("Rhulen") in this quest.[4] Plaintiff then arranged for the third-party defendant, the Zinman group, to act as a clearinghouse for policy documentation on insurance placed by Rhulen and as a depository for premium receipts and disbursements. Rhulen, meanwhile, arranged for two policies which were written by the defendants, Underwriters at Lloyd's ("the Underwriters"), through the broker, W.A. Stickland & Co. ("Stickland"). The first policy, No. 13/711/79, was effective as of May 3, 1979 in the amount of $225,000; the second, No. 13/774/79, was effective on September 3, 1979 and was for an additional $57,500 of coverage.[5]

In January of 1980, the inevitable happened—Sonsam failed the fertility test.[6] As a result, Guida made a claim under these policies which the Underwriters have refused to pay. Guida has now moved for summary judgment.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Because it is a drastic remedy, the court must resolve all doubts against the moving party and draw all inferences from the facts in favor of the parties opposing the motion. *Federal Laboratories, Inc. v. Barringer Research Ltd.,* 696 F.2d 271, 274 (3d Cir.1982); *Brown v. Caterpillar Tractor Co.,* 696 F.2d 246, 255 n. 19 (3d Cir.1982).

It is undisputed that the Underwriters issued and delivered to the plaintiff the two policies in question and that a loss took place under these policies. Nor is it contested that if plaintiff is successful, he will be entitled to a total of $282,500 as the agreed value of these policies except for any set-off to which the Underwriters may be entitled. In addition, I have previously ruled that plaintiff had an insurable interest in Sonsam. *See* Order dated August 31, 1982. The Underwriters do, however, assert they are not liable on the policies in whole or in part based on the following three theories: (1) that Guida either directly or through his agent made material misrepresentations and non-disclosures which render the policies void; (2) that plaintiff has made the enforcement of a salvage clause in the policies impossible thus relieving the Underwriters of any liability; and (3) that if plaintiff is permitted to recover, that the Underwriters are entitled to set-off all amounts plaintiff received by selling

2. In the same agreement, Pine Hollow Farm, Inc. also purchased a 25% interest in Sonsam.

3. This agreement was superseded by another agreement dated December 29, 1978. This agreement was also "conditioned upon SONSAM satisfactorily passing a comprehensive stallion fertility test to be conducted by a panel of veterinarians" and provided that "all parties are to be restored to a status quo position, 'ab initio' " should Sonsam fail the test.

4. It is disputed whether Rhulen acted as plaintiff's or the Underwriters' agent.

5. Both these policies named the defendant Barry Epstein as one of the loss payees. All the parties but the Underwriters admitted that Mr. Epstein's inclusion was a mistake. As a result, I ordered the policies reformed by eliminating him as loss payee. *See* Orders dated August 12, 1981 and September 23, 1981.

6. Sonsam's failing this test did not mean he was unable to stand at stud. It did, however, result in a reduced number of mares being successfully bred each season.

shares of Sonsam to others after the Underwriters denied his claims.

■ A threshold issue is to determine which law applies. As a federal court sitting in a diversity action, I must apply the laws of the forum including the forum's choice of law decisions. *Klaxon Co. v. Stentor Electric Manuf. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In 1964, the Supreme Court of Pennsylvania in *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), a tort case, adopted a combination of Professor Currie's "interest analysis" and the Restatement (Second) of Conflict of Laws "grouping of contacts" theory. The approach is a flexible one and permits the court to consider and weigh both the quality and quantity of contacts between all the potentially interested states and the parties in addition to each state's particular interest in and policies about the subject matter of the litigation. Although this approach has not yet been applied by the Pennsylvania Supreme Court in a contract case, it is the opinion of our Court of Appeals that it will. *Melville v. American Home Assurance Co.,* 584 F.2d 1306 (3d Cir.1978).

■ In the submissions all parties apparently have assumed the law of Pennsylvania applies. However, I note that the Underwriters had suggested with respect to an earlier motion by Rhulen for partial summary judgment that New York law would be more appropriate. Therefore, I believe some inquiry is prudent.

To begin, plaintiff is a citizen and resident of Pennsylvania.[7] In addition, third-party defendant Zinman is a Pennsylvania corporation with its principal place of business in the Commonwealth. The insurance policies at issue were delivered by Rhulen to Zinman in Pennsylvania who, in turn, forwarded at least one of them to plaintiff. On the other hand, Epstein is a Kentucky

citizen. Rhulen is a New York corporation. Lastly, the Underwriters are in a syndicate of insurance underwriters located in the United Kingdom.

In reviewing these contacts, it appears that of these jurisdictions, Pennsylvania has the most significant relationship with the matter before me. At the very least, no other state has any stronger ties. Thus I will apply Pennsylvania law.

■ The Underwriters' first defense to plaintiff's claims is that plaintiff made material misrepresentations and omissions when he applied for the insurance. Plaintiff counters with two positions which he says entitles him to summary judgment. First Guida asserts that Pa.Stat.Ann. tit. 40, § 441 (Purdon 1971), bars the Underwriters from introducing any evidence on the issue. This statute provides:

All insurance policies, issued by stock or mutual insurance companies or associations doing business in this State, in which the application of the insured, the constitution, by-laws, or other rules of the company form part of the policy or contract between the parties thereto, or have any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application as signed by the applicant, or the constitution, by-laws, or other rules referred to; and, unless so attached and accompanying the policy, no such application, constitution, or by-laws, or other rules shall be received in evidence in any controversy between the parties to, or interested in, the policy, nor shall such application, constitution, by-laws, or other rules be considered a part of the policy or contract between such parties.[8]

When plaintiff arranged for the coverage under the two policies here, he did not fill out or sign a formal application. Thus no application could have been attached to the

---

7. The Underwriters point out that the insurance policies list plaintiff's address as "c/o Laurence Shopping Center, Merrill Lynch, Route 1, Trenton, New Jersey 08648." It is clear from the record, however, that this was plaintiff's business address.

8. This statute has been applied by federal courts sitting in diversity cases. *See Ostrov v. Metropolitan Life Insur. Co.,* 379 F.2d 829 (3d Cir.1967).

policies when delivered to plaintiff. The question becomes then whether this statute bars the admission of evidence of oral and other written statements which were made during the time plaintiff sought insurance from the Underwriters.

The cases I have located which construe this statute deal with situations where formal written applications were made. *See, e.g., Ross v. Metropolitan Life Insurance Co.,* 403 Pa. 135, 169 A.2d 74 (1961); *Syme v. Bankers National Life Insurance Co.,* 393 Pa. 600, 144 A.2d 845 (1958). *Accord, Ostrov v. Metropolitan Life Insurance Co.,* 379 F.2d 829 (3d Cir.1967); *Nacchio v. New York Life Insur. Co.,* 200 F.2d 770 (3d Cir. 1952). However a case interpreting an earlier similar statute provides guidance.

In *Lenox v. Greenwich Insurance Co.,* 165 Pa. 575, 30 A. 940 (1895), the plaintiff's agent mistakenly orally told the insurance company that the property to be insured was a dwelling house.[9] In fact it was a feed store. The Supreme Court of Pennsylvania was called upon to apply the following statute in deciding whether the agent's statements were admissible:

> That all life and fire insurance policies upon the lives or property of persons within this commonwealth, whether issued by companies organized under the laws of this state, or by foreign companies doing business therein, which contain any reference to the application of the insured or the constitution, by-laws or other rules of the company, either as forming part of the policy or contract between the parties thereto, or having any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application, as signed by the applicant, and the by-laws referred to; and, unless so attached and accompanying the policy, no such application, constitution or by-laws shall be received in evidence, in any controversy between the parties to, or interested in, the said policy, nor shall such application or by-laws be considered a part of the policy or contract between such parties.

Act of May 11, 1881, P.L. 20, No. 23, § 1 (repealed).

The court considered the underlying reason for this legislation:

> It is well known that the evil aimed at in this legislation was the custom of insurance companies to put in their blank forms of application long and intricate questions or statements to be answered or made by the applicant, printed usually in very small type, and the relevancy or materiality not always apparent to the inexperienced, and therefore liable to become traps to catch even the innocent unwary. The general intent was to keep these statements before the eyes of the insured, so that he might know his contract, and if it contained errors, have them rectified before it became too late.

*Id.* at 577, 30 A. at 941. *See Syme v. Bankers National Life Insur. Co., supra.* The court reasoned that "[t]here can be no 'correct copy as signed' of an oral application. . . ." *Id. Accord, Washington Fidelity Nat. Ins. Co. of Burton,* 287 U.S. 97, 53 S.Ct. 26, 77 L.Ed. 196 (1932) (D.C.Law). *Cf. Curry v. Sun Fire Office,* 155 Pa. 467, 26 A. 658 (1893). Thus, the court ruled that the agent's representations were not barred by the statute and were otherwise admissible.

The *Lenox* court's reasoning is persuasive in my resolution of the issue before me. Section 441 was intended only to bar the admission of the formal application itself unless it was attached to the policy as signed. It does not bar the admission of any oral statements made by plaintiff or his agents while seeking the insurance from the Underwriters.

Similarly other documents which are not formal applications for insurance are not barred from admission by section 441 merely because they arose as a result of plaintiff's request for insurance. The words of the statute clearly state that it applies only to the "application of the insured, the constitution, by-laws or other rules of the company. . . ." Documents which do not fall into any of those categories are not exclud-

---

**9.** No fraud or deceit was alleged.

ed by the statute. *See Employers' Liability Assur. Corp. v. Lebanon Auto Bus Co.,* 360 Pa. 42, 59 A.2d 880 (1948); *Davidson v. John Hancock Mut. Life Insur. Co.,* 152 Pa.Super.Ct. 63, 31 A.2d 585 (1943). *Cf. Moore v. Bestline,* 23 Pa.Super.Ct. 6 (1903) (allocatur refused) (same result under Act of 1881). Thus, despite plaintiff's argument, section 441 does not preclude the Underwriters from introducing otherwise admissible documents and testimony into evidence concerning possible material misrepresentations and omissions made by plaintiff when he applied for the policies at issue.

■ Next plaintiff contends that the Underwriters as a matter of law cannot prove that plaintiff made any such misrepresentations and omissions. In Pennsylvania, an insurer must show three elements to void a policy based on misrepresentation: (1) that the declaration by the insured was false; (2) that the false declaration was material to the risk insured; and (3) that the insured knew it to be false or made the statement in bad faith. *Lotman v. Security Mutual Life Insur. Co. of New York,* 478 F.2d 868, 870–71 (3d Cir.1973), *quoting Bremmer v. Protected Home Mutual Life Insur. Co.,* 218 Pa.Super.Ct. 364, 280 A.2d 664 (1971) (allocatur refused); *McCloskey v. New York Life Insur. Co.,* 292 Pa.Super.Ct. 1, 436 A.2d 690 (1981); *Transit Cas. Insur. Co. v. Nationwide Mut. Insur. Co.,* 537 F.Supp. 65 (E.D.Pa.1982). These three factors are in most instances questions for the jury. *See Evans v. Mutual Life Insur. Co.,* 322 Pa. 547, 186 A. 133 (1936); *Watson v. Metropolitan Life Insur. Co.,* 145 Pa.Super.Ct. 369, 21 A.2d 503 (1941); *Wolfson v. Mutual Life Insur. Co. of New York,* 455 F.Supp. 82

(M.D.Pa.) *aff'd mem.,* 588 F.2d 825 (3d Cir. 1978); *Bird v. Penn Central Co.,* 334 F.Supp. 255 (E.D.Pa.1971). Thus plaintiff will be entitled to summary judgment only if the Underwriters cannot put forth sufficient facts to raise a genuine issue as to any one of the three elements necessary to establish a case of misrepresentation.

■ It is the Underwriters' position that plaintiff misrepresented the extent and nature of his ownership interest in Sonsam. The Underwriters state they were under the belief that plaintiff had a non-contingent 25% interest. In fact, plaintiff's interest was conditioned upon Sonsam's passing a fertility test.[10] Moreover, as of the effective date of the first policy, plaintiff owned only a 12–½% interest as he had sold five of his ten shares of Sonsam.[11]

In my opinion there is evidence in the record to raise questions of fact as to all three of the elements necessary to establish a case of misrepresentation. First there is evidence that the Underwriters did not know the nature and extent of Guida's interest in Sonsam when the policies were written. *See* Hall Affidavit In Opposition to Motion. The Underwriters state they assumed that plaintiff had an unconditional interest. Plaintiff contends that Hall, one of the underwriters, contradicts his affidavit in his deposition testimony. Whether this is so and to what end is for a jury to decide.

Plaintiff and Rhulen, which supports plaintiff's motion, also claim that a telex sent to Stickland prior to the writing of plaintiff's policies which concerned insurance for Barry Epstein's interest in Sonsam alerted the Underwriters to the contingent nature of plaintiff's interest.[12] Whether

---

**10.** The agreement under which plaintiff acquired an interest in Sonsam was amended after Sonsam failed the fertility test. This new agreement dated January 23, 1980 reduced the purchase price 40%. Moreover, it provided that plaintiff had the right to cancel and rescind the agreement if it were determined that Sonsam could not breed at least 40% of the mares already scheduled to be bred. Plaintiff has since sold all of his remaining shares in Sonsam. *See* note 1 *supra.*

**11.** The agreements by which plaintiff sold these five shares provided that plaintiff would refund the buyers' money if Sonsam failed the fertility test.

**12.** The telex states that Epstein had only a 50% interest in Sonsam as a result of an agreement which was contingent on Sonsam passing the fertility test. The telex then quotes the contingency language from the August 17, 1978 agreement. The telex is dated October 24,

this telex which does not mention plaintiff and which did not concern any insurance on Sonsam for him was ever shown to the Underwriters [13] directly or whether it was sufficient to apprise them of the nature of plaintiff's interest are questions for the jury. Thus there is a genuine dispute as to whether they were under a false impression as to plaintiff's interest.

Similarly, there is evidence to show that the knowledge of the true nature of plaintiff's interest was material to the Underwriters. The Underwriters, through Hall, state they would not have written the policies had they been aware of the contingent nature of Guida's interest. *See* Hall Affidavit, *supra.* Plaintiff again counters by saying Hall contradicts his affidavit in his deposition. A jury should resolve the credibility of Hall's testimony.

The facts concerning the last element are fuzzy at best. Plaintiff asserts that he disclosed the nature and quantity of his interest in Sonsam to Rhulen. *See* Guida Deposition at 91 & 146. Indeed the "Epstein" telex referred to earlier from Rhulen to Stickland quotes the contingency part of the August 17, 1978 agreement. It is not clear exactly what Rhulen told Stickland about plaintiff's interest. A representative of Stickland testified that they were unaware of the nature of plaintiff's interest. Willson Deposition at 24–25 & 35. Sorting out the facts and assessing the credibility of the witnesses can best be done by a jury. In particular, it is for the jury to decide whether Rhulen was acting as plaintiff's agent in these transactions. The Underwriters contend this was so. Plaintiff, however, asserts Rhulen had advertised in trade publications as being a Lloyd's agent.

Whether the Underwriters' assumption that plaintiff was an unconditional owner of an interest in Sonsam was the result of negligence or from behavior rising to the level of intentional material misrepresentations and omissions can best be determined by a jury at trial where the credibility of

1978, approximately seven months before plaintiff first sought his fertility insurance.

the witnesses can be assessed first hand. Information and correspondence went through several persons. Thus the jury is the appropriate entity to unravel the facts and judge just what occurred.

■ One more issue needs to be addressed. Rhulen asserts that the Underwriters have waived any right they may have had to avoid the policies because it had prior notice of the nature of plaintiff's interest in Sonsam and that with reasonable diligence they could have ascertained the nature of plaintiff's interest. Rhulen primarily relies on the case of *Annett v. Nationwide Life Insur. Co.,* 410 F.Supp. 1265 (E.D.Pa.1976). For a waiver to occur, the insurer must first have notice at the time the policy is issued of facts which would put a reasonable person on notice to make further inquiry. *First Pennsylvania v. United States Life Insur. Co.,* 421 F.2d 959 (3d Cir.1969). *See generally,* 19 P.L.E., Insurance § 265 (1959 & Supp.1982). Rhulen asserts that the "Epstein" telex put the Underwriters on notice of plaintiff's contingent interest. As stated above, the evidence in the record is not convincing as a matter of law that this telex provided the requisite notice. In addition, until the insurer has such notice, there is no duty to make further inquiries in order to avoid a waiver. *See Franklin Life Insur. Co. v. Bieniek,* 312 F.2d 365 (3d Cir.1962).

■ Similarly, I cannot say at this juncture that the Underwriters are estopped from refusing plaintiff's claims. Again, an essential element of equitable estoppel is that Lloyd's had actual or constructive knowledge of the real facts. *In Re Watt's Estate,* 409 Pa. 44, 185 A.2d 781 (1962). A jury must determine what knowledge they had.

The record does not permit me to accord plaintiff the pre-trial judgment he seeks. Accordingly, his motion for summary judgment will be denied.[14]

**13.** In the telex Rhulen asked Stickland to show the telex to Hall.

**14.** Because of the disposition of plaintiff's mo-

tion, I need not decide at this time the merits of the Underwriters' defenses discussed in the submissions on plaintiff's motion regarding the effect of the salvage clause and their possible right to set-off.