**CUTTER & BUCK, INC., Plaintiff,**

**v.**

**GENESIS INSURANCE COMPANY,**
**Defendant.**

**No. C02–2569P.**

United States District Court,
W.D. Washington,
At Seattle.

Feb. 11, 2004.

Grant S. Degginger, Larry Steven Gangnes, Lane Powell Spears Lubersky, Seattle, WA, for Plaintiff.

Cynthia T. Andreason, Daniel J. Standish, Wiley, Rein & Fielding, Washington, DC, Jeffrey David Laveson, Nicholas P. Scarpelli, Jr., Carney, Badley, Spellman, Seattle, WA, Hank Brier, Sedgwick, Detert, Moran & Arnold, San Francisco, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PECHMAN, District Judge.

There are eight motions currently before the Court in this case: 1) Plaintiff

Cutter & Buck, Inc.'s ("C & B") Motion for Partial Summary Judgment Regarding Wrongful Rescission, (Dkt. No. 143); 2) Defendant Genesis Insurance Company's ("Genesis") Motion for a Continuance Under Federal Rule of Civil Procedure 56(f), (Dkt. No. 173); 3) Genesis' Motion to Strike Material Contained in Plaintiff's Reply, (Dkt. No. 185); 4) Genesis' Motion for Summary Judgment on C & B's Breach of Contract Claim, (Dkt. No. 206); 5) Genesis' Motion for Summary Judgment on C & B's Breach of Duty of Good Faith and Fair Dealing Claim, (Dkt. No. 205); 6) C & B's Motion to Strike Portions of the Declaration of Martin Hacala, (Dkt. No. 222); 7) C & B's Motion for Partial Summary Judgment Regarding Coverage for Settlement and Defense Costs for Shareholder Suits and Securities Investigations, (Dkt. No. 209); and 8) C & B's Motion for Partial Summary Judgment Regarding Reasonableness and Non–Allocation of Settlement, (Dkt. No. 211).

Having considered all of the pleadings and supporting documents, the Court DENIES C & B's Motion for Partial Summary Judgment Regarding Wrongful Rescission and GRANTS Genesis' Motion for Summary Judgment on C & B's Breach of Contract Claim. First, C & B made material misrepresentations with an intent to deceive in the 2001/2002 and 2002/2003 underwriting processes thereby giving Genesis a right to rescind the 2001/2002 and 2002/2003 Policies. Specifically, the materials that C & B was required to submit with the 2001/2002 renewal application and statements C & B made in the May 24 meeting and the first of the two August 1 conference calls contained material misrepresentations made with an intent to deceive. This alone gives Genesis the right to rescind the policy. Therefore, it is irrelevant that there may be genuine issues of material fact as to whether Fran Conley's statements in the August 1 conference calls and the August 7 letter were

material misrepresentations made with an intent to deceive.

Second, Genesis did not waive its right to rescind. Genesis did not knowingly and voluntarily relinquish its right to rescind because it did not know that it had a right to rescind until the August 12 press release. As of August 14, Genesis undertook an investigation of the facts that gave rise to its right to rescind. Once it confirmed those facts in late October/early November, it rescinded shortly thereafter. At the least, Genesis did not knowingly and intentionally waive its right to rescind after August 12 when it learned that it had a right to rescind.

Third, the severability of application provision in the D & O policy did not prohibit Genesis from rescinding coverage for all directors and officers and for the C & B entity as a whole. The language in the severability of application provision allows for only one reasonable interpretation. Under this interpretation, Steve Lowber's knowledge of the material misrepresentations in the renewal application is imputed to otherwise innocent directors and officers because Lowber signed the renewal application. C & B has failed to put forth sufficient evidence that it intended to prevent the signor's knowledge from being imputed to otherwise innocent directors and officers when it requested that the policy include a severability of application provision.

Additionally, the Court GRANTS Genesis' Motion for Summary Judgment on C & B's Breach of Duty of Good Faith and Fair Dealing Claim. Given the Court's holding on C & B's rescission motion and Genesis' breach of contract motion, C & B's argument that Genesis' rescission was in bad faith necessarily fails.

The Court STRIKES Genesis' Motion for a Continuance as moot. The Court renoted C & B's Motion for Partial Sum-

mary Judgment, for which Genesis had requested the continuance, so that the Court could consider C & B's motion with Genesis' motions since they are essentially cross-motions. It was renoted from October 31 to January 2. By doing so, Genesis' Motion for a Continuance became moot.

The Court DENIES Genesis' motion to strike. Genesis requested that in the alternative to striking the disputed material, that the Court consider the full sources that were the subject of the motion to strike. As requested, the Court considered those full sources. Consequently, there is no need for the Court to strike the disputed portions of C & B's Reply.

The Court STRIKES as moot C & B's Motion to Strike Portions of the Declaration of Martin Hacala. The Court has not relied upon this declaration in ruling on any of these motions.

Lastly, the Court requests a telephone conference with the parties to discuss the status of the two remaining motions—C & B's Motion for Partial Summary Judgment Regarding Coverage for Settlement and Defense Costs for Shareholder Suits and Securities Investigations and C & B's Motion for Partial Summary Judgment Regarding Reasonableness and Non–Allocation of Settlement—in light of the rulings in this Order. **The Court will hold the phone conference on Friday, 13, 2004 at 11:00 am.** Counsel for Genesis is directed to initiate the conference call. Once Genesis' counsel has all of the C & B counsel on the line who wish to participate, they are directed to phone to Court.

## BACKGROUND

C & B is a Washington company involved in the retail sportswear business.

Genesis provided C & B with Directors and Officers ("D & O") insurance coverage beginning in 1995. On December 6, 2002, Genesis rescinded the D & O coverage as to all directors and officers and the C & B entity as a whole, claiming that C & B had made material misrepresentations with an intent to deceive in the 2001/2002 and 2002/2003 underwriting processes. The majority of these motions concern whether that rescission was lawful.

In April, 2000, C & B engaged in a series of distributor transactions ("D/Ts") with three companies in which C & B sent its product to these distributors and accounted for the shipments as sales. However, they were not sales. Instead, the distributors were to hold the product until C & B could find actual buyers. C & B did this as a means to increase revenue to keep pace with Wall Street expectations. By April, 2001, C & B had not sold the bulk of the product. In April, the distributors returned the product to C & B. Rather than accounting for these returned goods in the proper sales channel from which they had been "sold," C & B hid these returns in various other sales channels.

C & B's insurance policy with Genesis was up for renewal in August, 2001. On May 24, 2001 [1], Genesis underwriting agent Winnie Van met with C & B's then-CFO Steve Lowber, then-CEO Harvey Jones, then-COO Martin Marks, to discuss the coverage renewal. Van asked C & B's officers about C & B's revenue recognition and right of return policies. She was told that C & B continued to have a conservative revenue recognition policy, meaning that it only recognized revenue when prod-

---

1. There is some discrepancy in the pleadings about whether this meeting was on May 22 or May 24. Van stated in her deposition that there was only one meeting and that references to these two different dates must have contained a typographical error. She could not recall on which date the meeting actually occurred. (Gangnes Dec., Ex. E at 44). In the interest of consistency, the Court will refer to this meeting as the May 24 meeting.

uct was sold to customers, and that C & B continued to have a limited right of return, meaning that returns were allowed only for defective products.

In August, 2001 Lowber filled out and signed a renewal application. (Appendix to Pl's Mot. for Partial Summ. J. ("Appendix"), Ex. A). The application required that C & B's Annual Report, SEC filings, and CPA letter be submitted with the application. The application required that the signor declare that the "statements herein" are true and complete. C & B did not actually physically attach the required additional documents to the renewal application when it was signed and submitted in August, 2001. On October 25, 2001, C & B sent some of the required documents to Genesis. Genesis issued the Policy binding coverage for 2001/2002 on October 31, 2001. (Df's Resp., Andreason Dec ("Andreason Dec. 1"), Ex. M; Df's Mot. for Summ. J., Andreason Dec. ("Andreason Dec. 2"), Ex. 9 at 54–55 and Exs. 21 & 22). This evidence shows that C & B was slow in providing the required materials. Genesis maintains that because of this, it accessed the other required documents, which were publically available SEC documents, via the internet. (Def's Mot. for Summ. J. at 7 n. 6). C & B does not contest this fact.

In April, 2002, Jones resigned as CEO and Marks resigned as COO. Fran Conley, an outside member on C & B's Board of Directors and Audit Committee, was appointed interim CEO. In late July, Conley discovered the D/Ts. She and C & B's other Board members had not been told about these transactions when they occurred or when the product was returned a year later. She began an investigation on July 26. She contacted C & B's outside counsel and C & B's auditors Ernst & Young ("E & Y") with whom she continued to investigate the matter.

C & B's 2001/2002 D & O insurance policy with Genesis was set to expire on August 8, 2002. On August 1, Van had two conference calls with C & B's representatives. In the first, Van spoke with Conley, Lowber, Susan Yount (C & B's risk manager), and C & B's two insurance brokers. C & B's representatives told Van about the D/Ts and C & B's investigation to date. They made certain statements during this phone call, which are discussed below in detail. They indicated that C & B was continuing to investigate the matter. In the second call, Van spoke with Conley about the D/Ts and about C & B's revenue recognition and right of return policies.

After the two conference calls, Genesis sent C & B a notice indicating the terms upon which it would renew the coverage. (Gangnes Dec., Ex J., Sub–Ex. 3). Based on the information in the conference calls, Genesis proposed increasing the deductible for securities claims and increasing the premiums threefold. The reason Genesis proposed these new terms is disputed, as discussed below. The letter also indicated that renewal was contingent on there being "no material adverse change after the conference call discussions on August 1 . . . ." (*Id.*)

On August 7, Conley sent a letter notifying Genesis of circumstances that could potentially give rise to a claim against C & B. (Appendix, Ex. C). This letter was sent pursuant to Section VII.B of the 2000/2001 Policy, which required that if C & B became aware of circumstances that could give rise to a claim prior to the Policy's cancellation or expiration upon non-renewal, then C & B must notify Genesis in writing of those circumstances. Because the 2001/2002 Policy was set to expire on August 8, this was the last day that C & B could submit a notice of circumstances to have claims covered by that Policy. The letter discussed the D/Ts, stating that they

were intended to improve regional sales, and that they were recorded as sales, although it was now apparent that they should not have been because the distributors were not creditworthy. It stated that the inventory had been returned and allocated to multiple accounts rather than the single account from which the inventory had been sold. It also stated that C & B would restate its 2000 and 2001 financial statements. Lastly, it indicated that C & B was continuing to investigate the matter.

On August 8, Genesis sent C & B a letter stating that "this letter confirms our agreement to bind Directors and Officers Liability extending our current coverage . . . . Please note that our agreement to bind assumes that there have been **no material adverse changes** since the conference calls between Genesis and the Company on August 1, 2002. . . . . A complete binder letter, with attached specimen forms, will be provided to you as soon as practicable." [2] (Andreason Dec. 1, Ex. V (emphasis in original)).

On August 12, C & B issued a press release that stated:

> The business transactions [ (the D/Ts) ] at issue were not disclosed to the Company's then outside members of its Board of Directors and were not discussed with the Company's auditors. Rather, there is evidence that the Company's standard accounting practices and controls were circumvented and that sales returns in fiscal 2001 were intentionally mis-allocated to several of the Company's business lines instead of the business line under which those sales were originally booked. The Committee believes that some members of the Company's former management may have received increased incentive compensation as a result of the overstated FY 2000 financial result.

> . . . . .

> The managers responsible for these business decisions and those who were responsible for the integrity of the Company's financial statement no longer have any role with the Company. They include [Jones], [Marks], [and Lowber] . . . ."

> . . . . .

> Due to the discovery of the accounting irregularities, the Company's auditor, Ernst & Yong, believes there is a material weakness in the Company's internal controls and operations.

(Appendix, Ex. D).

On August 14, Genesis sent C & B a letter stating that Genesis was "agreeable to extending the expiration date of the above referenced Policy through Genesis [ ] to August 8, 2003" based on the August 1 indication notice, subsequent negotiations, and the August 7 letter from C & B. (Appendix, Ex. E). The extension was subject to:

> Satisfactory receipt and review of a completed . . . Renewal Application, and all information and documentation requested therein, including:
> - 2002 Annual Report
> - Latest CPA letter to management on internal controls and managements's written responses thereto
> - All correspondence between the company's auditor and the company's Audit Committee regarding accounting irregularities, remedying internal controls and investigation.

(*Id.*) Again, Genesis conditioned the extension on there being "no material change after the conference call discussion on August 1, 2002 between the Company and Genesis." (*Id.*) Genesis attached to the

---

**2.** Genesis decided to extend the coverage rather than renew it.

letter changes and amendments to the proposed Policy.

On August 21, C & B's broker forwarded C & B's payment for the 2002/2003 premium to Genesis, which Genesis cashed sometime thereafter.

On August 27, C & B sent the 2002/2003 renewal application signed by Conley to Genesis. (Gangnes Dec., Ex. O). As before, the additional required materials were not attached to the application. By early September, C & B had provided only the original application and the Annual Report. On September 11, a Genesis representative sent an email to one of C & B's insurance brokers requesting that C & B submit the other required materials. (Andreason Dec. 1, Ex. Y).

Beginning in September, 2002 a series of shareholder suits were filed against C & B. C & B tendered the first claim to Genesis on September 25. On October 3, Genesis hired outside legal counsel to assist Genesis in investigating the claims and to represent its interest in C & B's claims for coverage. On October 10, C & B restated its financial statements for 1998, 1999, 2000, and 2001. On October 16, Genesis' counsel requested that C & B's counsel send copies of all documents in the shareholder litigation and all documents produced to the SEC. (Andreason Dec. 1, Ex. Z). Sometime after this, Genesis obtained key documents detailing the accounting scheme and improprieties that C & B had discovered sometime in late August and September, including documents indicating that Lowber and other officers had knowingly and intentionally participated in the scheme. On December 6, Genesis sent C & B a notice of rescission based upon material misrepresentations of fact made by C & B to Genesis in the underwriting process for both the 2001/2002 and 2002/2003 Policies. (Appendix, Ex. F).

In August, 2003, Lowber pled guilty to wire fraud. (Andreason Dec. 1, Ex. I). In addition, the SEC entered a Cease and Desist Order in which C & B agreed to settle with the SEC. (*Id.*, Ex. B).

## ANALYSIS

Summary judgment is not warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

### I. Applicable Law

While the parties do not address this issue in their briefings, Washington law applies to this insurance contract dispute. The 2001/2002 Policy states that the terms of the Policy are to be construed based on the laws of the jurisdiction "in which the situation forming the basis for this contro-

versy arose." (Appendix, Ex. B at 9). The situation forming the basis for this controversy undisputedly arose in Washington. Consequently, the many citations to non-Washington cases in both parties' briefing is persuasive but not binding authority.

## II. Rescission Based on Misrepresentations in the 2001/2002 and 2002/2003 Underwriting Processes

Washington state law limits when an insurance company may rescind a contract. RCW 48.18.090(1) provides:

> [N]o oral or written misrepresentation or warranty made in the negotiation of an insurance contract … shall be deemed material or defeat or avoid the contract[,] … unless the misrepresentation or warranty is made with the intent to deceive.

Thus, under governing state law, Genesis could properly rescind C & B's D & O policy only if 1) C & B represented certain information as truthful to Genesis during the negotiation of the insurance contract, 2) those representations were untruthful; that is, they were misrepresentations, 3) the misrepresentations were material, and 4) they were made with the intent to deceive Genesis.

Genesis maintains that various documents submitted in conjunction with the 2001/2002 renewal application, as well as letters and statements made during phone conferences and meetings all contained material misrepresentations made with the intent to deceive. C & B does not substantially dispute that these documents and oral communications contained inaccuracies, or that they were material. C & B's central argument is that none of these constitute representations by C & B to Genesis. In other words, C & B argues that it did not represent to Genesis that the information in these documents or communications were truthful. Addition-

ally, C & B disputes that these statements were made with the intent to deceive.

As discussed below, the Court concludes that the 2001/2002 renewal application, the May 24 meeting, and the first of the August 1 conference calls contained material misrepresentations made with an intent to deceive. Based on this alone, Genesis had a right to rescind the 2001/2002 Policy and the 2002/2003 Policy extension. Consequently, the Court need not reach the question of whether C & B made material misrepresentations with an intent to deceive in the second of the August 1 conference calls, the August 7 letter, or the August 12 press release.

### A. C & B's representations to Genesis

#### 1. C & B's Annual Report, CPA letter, and SEC filings

■ The renewal application that C & B filled out for the 2001/2002 underwriting process listed C & B's Annual Report, CPA letter, and SEC filings as "additional required application materials." (Appendix, Ex. A). Additionally, the application, signed by Lowber, stated:

> FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED … DECLARES THAT … THE STATEMENTS HEREIN ARE TRUE AND COMPLETE.
> THE INFORMATION CONTAINED IN AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND ALONG WITH THE APPLICATION (TOGETHER WITH ALL PREVIOUS APPLICATIONS AND MATERIAL CHANGES THERETO WHICH THE INSURER RECEIVES NOTICE) IS CONSIDERED PHYSICALLY ATTACHED TO THE POLICY AND WILL BECOME A PART OF IT. THE INSURER WILL HAVE RELIED UPON THIS APPLICATION AND ATTACHMENTS IN ISSUING ANY POLICY.

THE APPLICATION WILL BECOME A PART OF SUCH POLICY IF IS-SUED.

(*Id.*) C & B argues that "statements herein" include only statements that were physically written on the renewal application itself, but does not include statements in the "additional required application materials."

While the contract language quoted above does not specifically state that the "additional required application materials" would be deemed part of the renewal application, the language taken as a whole supports such a conclusion. The additional documents were explicitly deemed "additional required application materials" in the renewal application. As such, they were necessarily part of the renewal application materials. Moreover, the contract indicates that Genesis would rely on the materials attached to the application in issuing any policy. By including this language, Genesis communicated that it would rely on the signor's representation that all of the statements that were part of the application, including the attached documents, were true. This puts the signor on notice that by attaching the required documents to the renewal application, he represented them as true and correct when he signed the application.[3] Therefore, C & B's statements in these additional required documents are within the scope of "statements herein" that the signor represented as true and complete.

This case is distinguishable from both of the cases upon which C & B relies. In *Federal Ins. Co. v. Oak Indus.* an unpublished decision from the Southern District of California, a company applied to a new D & O insurer for coverage of the previous 12 years. No. 85–985, 1986 WL 2699 (S.D.Cal. Feb. 3, 1986). The D & O policy, however, did not require that the applicant represent that the public filings and statements from the past 12 years were accurate. As a result, the court held that the company expressly bargained for continuity of coverage and waiver of any misrepresentation of fact occurring prior to the date of the policy. By the contract's terms, the only declarations and statements that the insurance company could rely upon in issuing the policy were those contained within the application. Unlike the C & B–Genesis renewal application, there is no indication that the application in *Oak Indus.* required the applicant to attach financial statements. Therefore, given the fact that Genesis' renewal application required C & B to submit certain documents with the application, together with the lack of evidence that C & B

---

**3.** The fact that C & B did not actually physically attach the required additional documents to the renewal application is not dispositive because C & B had unequivocal notice that Genesis would rely upon those documents in issuing the policy. In late October, 2001, Genesis notified C & B that Genesis had not yet received the additional required documents and that the policy would be cancelled shortly if the documents were not sent to Genesis immediately. (Andreason Dec. 2, Ex. 21). In response, C & B sent Genesis some of the required documents. Genesis maintains that it accessed the other required documents, which were publically available SEC documents, via the internet because C & B was slow in provid-ing the required materials. C & B does not appear to contest either that it was slow in providing the information or that this is why Genesis accessed those publically available documents via the internet. It is disingenuous for C & B to fail to provide the required documents in a timely fashion, thereby forcing Genesis to access them through another means, and then take refuge in their failure by claiming that they never attached these documents. Thus, even though the required documents were not physically attached to the renewal application at the time it was signed and sent to Genesis, C & B had notice that they were a necessary part of the application materials upon which Genesis would rely.

expressly bargained for waiver of any misrepresentation in the additional required documents, these additional documents are within the "statements herein" that Lowber declared to be true and correct.

C & B's reliance upon *National Union Fire Ins. v. Cont'l Ill. Corp.* ("*CIC*") is equally unpersuasive. 643 F.Supp. 1434 (N.D.Ill.1986). In *CIC,* the company submitted a standard-form renewal application for D & O insurance to two different insurance companies. The application stated that attachments to the application were made part of it and required the signor to declare that statements herein are true. However, rather than accepting that application, both insurance companies responded by sending different renewal applications to the company for it to fill out. Neither application included this same incorporation language. Consequently, the court held that "[b]y the terms of their forms, neither [insurer] asked [the company] to represent or warrant the truth of the [attached] financial statements. They merely asked that the statements be 'attached.'" *Id.* at 1441. In reaching this conclusion, the court pointed to language in the insurers' respective applications that explicitly stated what documents would constitute the complete application—the attached documents were notably absent from that language. *Id.* at 1440. Thus, the facts in *CIC* are not entirely identical to the facts here because C & B and Genesis did not have a similar back and forth of different versions of an application and the C & B–Genesis application did not contain explicit language about what would constitute the completed application one way or the other.

The language in the 2001/2002 Policy itself further bolsters the conclusion that C & B represented the additional required documents as true. It states "[b]y acceptance of this Policy the DIRECTORS and OFFICERS and the COMPANY agree: 1)[t]hat the statements in the Application or in any materials submitted therewith are their representations ...., and that this Policy is issued in reliance upon the truth of such representations." (Gangnes Dec., Ex. J, Sub–Ex. 9, Section VIII.C). While this language does not specifically indicate that C & B represented the statements in the renewal application and attached materials as truthful, it does indicate that C & B agreed to construe the renewal application and attached materials as "representations." It also indicates that C & B had notice that Genesis would rely on the veracity of the attached documents in issuing the Policy.

While this conclusion arguably contradicts deposition testimony by Genesis' Senior Claims Attorney Elizabeth Shaver, the plain language of the contract should trump such contradictory testimony. In her deposition, Shaver was asked "there's nothing in [the 2001/2002] application to warrant the accuracy of the financial statements of the company, correct?" to which she answered "in the nature of a warranty, that's correct." (Gangnes Dec., Ex. F at 155). Moreover, to the extent that this statement purports to interpret the language in the application, which formed part of the policy contract, it is inadmissible as a legal conclusion because contract interpretation is a matter of law to be determined by the court.[4]

---

4. Furthermore, a warranty and a representation are not necessarily the same thing. A representation is "[a] presentation of fact—either by words or by conduct—made to induce someone to act, esp. to enter into a contract" (Black's Law Dictionary, 7th Ed.1999). A warranty is "[a]n express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties" (*Id.*) The definition goes on to highlight the ways in which a warranty is distinct from a representation: "a

■ Lastly, C & B argues that Washington's attachment statute prohibits Genesis from introducing as evidence the "additional required application materials" because they were not physically attached to the 2001/2002 Policy. The relevant portion of Washington's attachment statute reads:

> No application for the issuance of any insurance policy or contract shall be admissible in evidence in any action relative to such policy or contract, unless a true copy of the application was attached to or otherwise made a part of the policy when issued and delivered.

RCW 48.18.080(1). Genesis contends that language in the Policy incorporating the attached documents satisfies the "otherwise made a part of the policy" clause in RCW 48.18.080(1). The Policy stated:

> It is agreed and warranted that ... statements contained in the application for this Policy ... and any material submitted therewith ... are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

(Appendix, Ex. B, Section VIII.C).

C & B's argument is unpersuasive for three reasons. First, the only Washington case on point is not applicable in this instance because the rationale underlying its holding is distinctly absent here. *Lundmark v. Mutual of Omaha Ins. Co.*, 80 Wash.2d 804, 498 P.2d 867 (1972). In *Lundmark*, after completing a disability insurance application, the applicant learned of a previously unknown health condition. He notified the insurance company while the application was still pending. The insurance company drafted an interoffice memorandum discussing the new condition and changed the policy accordingly. The memorandum was not attached to the final policy. The court held that "the insured is entitled to have the whole application before him, if any part is to be used against him as a defense." *Id.* at 807, 498 P.2d 867. Because the memorandum was not attached to the policy, it was never presented to the insured for his review. Therefore, RCW 48.18.080 barred its admissibility as evidence. *Id.*

However, the issue that was central to the court's holding is not present in this case. The court was troubled by allowing the insurance company to use documents against the insured that the insured never had the opportunity to review. In contrast, here, the additional required documents were not created by Genesis. They were created by C & B itself. C & B had every opportunity to review the documents. Thus, there is no concern that Genesis created, without C & B's knowledge, secret documents upon which the Policy was based. In fact, C & B knew that it was required to attach these specific documents to the renewal application and that they would be relied upon by Genesis. In such a situation, the documents need not be physically attached to the policy to satisfy RCW 48.18.080(1). This same analysis distinguishes this case from the non-Washington cases C & B cites on this issue. (Pl's Mot. for Partial Summ. J. at 16 n. 7).

Second, C & B's interpretation of the statute is nonsensical. RCW 48.18.080(1)

---

warranty is always written on the face of the contract, while a representation may be written or oral; a warranty is conclusively presumed to be material, while the burden is on the party claiming breach to show that a representation is material; and a warranty must be strictly complied with, while substantial truth is the only requirement for a representation." (*Id.*) Shaver stated that C & B did not warrant the veracity of the attached documents. She did not state that C & B did not represent them as truthful. The distinction between a warranty and a representation reinforces the fact that Shaver's statement is a legal conclusion.

expressly provides for two means of attachment: physical attachment or otherwise made a part of the policy. This second means would be meaningless if physical attachment were always required as C & B contends. Here, by explicitly stating in the Policy that all documents attached to or submitted with the application are part of the Policy, the "additional required application materials" are "otherwise made part of the policy."[5]

Third, even if these documents are deemed not attached under RCW 48.18.080(1), they can still provide the basis for rescission under RCW 48.18.090(1). RCW 48.18.090(1) allows an insurance company to base rescission on an oral or written material misrepresentation made during the contract negotiation. Nothing in its language limits the misrepresentations to those that are attached to the Policy. The only case law addressing the apparent conflict between these two statutes is an unpublished opinion by a sister court in this district. *National Union Fire Ins. Co. v. Seafirst Corp.*, No C85–396R, 1987 U.S. Dist. LEXIS 14394 (W.D.Wash. Dec. 23, 1987). In *Seafirst*, Judge Rothstein concluded that, in light of 48.18.090(1), 48.18.080(1) "does not necessarily exclude the possibility of basing an action for rescission on statements not included in the application." *Id* at *3. To hold otherwise would render 48.18.090(1) meaningless. Judge Rothstein pointed to *Guida v. Underwriters at Lloyd's*, an Eastern District of Pennsylvania case that interpreted a Pennsylvania statute requiring that the application be attached to or contained within the policy to be admissible. 563 F.Supp. 1015 (E.D.Pa.1983). *Guida* held that the attachment statute bars only the admission of the formal application itself if it is not attached to the policy. It does not bar the admission of oral statements made by the applicant when seeking insurance. *Id.* at 1019. Therefore, this Court holds that RCW 48.18.080(1) does not bar admission of unattached oral or written representations in determining if rescission is warranted under RCW 48.18.090(1).

In summary, C & B represented to Genesis that its Annual Report, CPA letter, and SEC filings, which were listed as "additional required application materials" in the 2001/2002 renewal application, were true and correct.

### 2. Statements C & B Made During the May 24 Meeting and August 1Phone Conference

Genesis contends that in the May 24, 2001 meeting between Van and Lowber, Marks, and Jones, C & B's officers made representations to Genesis regarding the status of C & B's business, including C & B's revenue recognition policy. C & B does not dispute that this meeting took place, nor that its officers discussed its revenue recognition policy with Van. C & B argues that this cannot constitute a rep-

---

5. *Township of Bristol v. Midland Ins. Co.* upon which C & B relies, does not support C & B's argument on this issue. 1986 WL 5332, *3 (E.D.Pa.1986). The court concluded that, had the policy made explicit reference to the application, it would have been considered attached to the policy under Pennsylvania's attachment statute even if it was not physically attached. The Court disagrees with one of the other non-Washington cases upon which C & B relies. *Brasure v. Optimum Choice Ins. Co.*, 37 F.Supp.2d 340 (D.Del.1999). Interpreting Delaware's attachment statute, which is similar to Washington's, the *Brasure* court concluded that it was not sufficient to refer to the application in the policy or to declare it a part of the policy without actually attaching it to policy. Most of the other non-Washington cases that C & B cites interpreting attachment statutes are of no assistance because they do not interpret state statutes with language similar to RCW 48.18.080.

resentation upon which Genesis could rescind the policy because the meeting was not memorialized and attached to the 2001/2002 Policy as required by RCW 48.18.080(1). However, based on the holding above, oral representations need not be memorialized and attached to the Policy to be a basis for rescission under RCW 48.18.090(1). Consequently, C & B's statements during this meeting are properly considered representations.

Likewise, Genesis contends that in the first of two August 1, 2002 conference calls between Van and Lowber, Conley, and C & B's insurance brokers, C & B made representations regarding the accounting for the D/Ts, how C & B interpreted the D/Ts, and how it would handle them. Again, C & B does not dispute that this conference call occurred, nor that C & B representatives made these statements. Based on the holding above, C & B's statements during these calls are properly considered representations for purposes of RCW 48.18.090(1).

## B. *Misrepresentations*

The Annual Report, CPA letter, and SEC filings all contained misrepresentations. C & B's SEC 10–K filing for fiscal year ending April, 2001 stated that "revenue is recognized at the time the product is shipped to the customer .... There is no right of return for customers, other than for defective products." (Andreason Dec. 1, Ex. L at NASD00093). The 2001 Annual Report made these same statements. (Andreason Dec. 1, Ex. HH at CBUK 007344). The June 20, 2001 CPA letter from C & B to E & Y stated that "[t]here are no material transactions that have not been properly recorded in the accounting records .... There are were no agreements to repurchase assets previous-

ly sold ... There has been no fraud involving management or employees who have significant roles in internal control." (Andreason Dec. 1, Ex. FF). In contrast, in April, 2000, C & B engaged the D/Ts, recognizing revenue for products that it had not yet sold. A year later, it accepted the return of that product even though there was nothing defective with the product. C & B officers and employees then hid the returns in other sales channels so that they would not be recognized as large returns. According to Genesis, these facts directly contradict the representations C & B made in these documents regarding its revenue recognition policy and limited right of return policy. C & B does not contend that the statements in the Annual Report, CPA letter, and SEC filings were true.[6] In fact, C & B implicitly accepts the proposition that these documents contained false information when it argues that Genesis wrongly imputed the Lowber's knowledge of the false information within these documents to other directors and officers. (Pl's Resp. at 11).

Similarly, C & B's statements during the May 24 meeting were misrepresentations. Van stated that in the May 24, 2001 meeting with Lowber, Marks, and Jones, she asked about C & B's revenue recognition policy, specifically what the rights of return were. She was told that there were no rights of return other than for quality issues. (Gangnes Dec., Ex. E at 52). Genesis contends that this was a misrepresentation because C & B had just accepted the return of the goods in the D/Ts in April, 2001. C & B does not appear to dispute that C & B's statements in this meeting were inaccurate.

During the first of the two August 1, 2002 conference calls, Conley discussed the

---

**6.** While C & B argues that the statements in the application were true, C & B refers only to the handwritten answers in the application

form itself, not the statements in the Annual Report, CPA letter, and SEC filings.

recently discovered D/Ts, stating that they were problematic because the revenue was recognized in 2000, but should not have been because the products were returned in 2001. (Gangnes Dec., Ex. E ("Van Dep.") at 115). Van understood that C & B was using the D/Ts to accomplish just-in-time delivery. (*Id.* at 143). In this context, Van specifically asked about the rights of return. Lowber told her that even though C & B had not found the contracts for the D/Ts yet, there could not have been rights of return because otherwise he would not have booked the D/Ts as revenue. (Gangnes Dec., Ex. E ("Van Dep.") at 129). Again, C & B does not, nor could it, contest that the falsity of Lowber's representation.

### C. Materiality of the Misrepresentations

■ A representation made in conjunction with an insurance policy application or negotiation is material if the representation influenced the insurance company's decision to issue the coverage. *Queen City Farms, Inc. v. Central National Ins. Co. of Omaha*, 126 Wash.2d 50, 100, 882 P.2d 703 (1994). Information is material if the information measures the risk, which is "the touchstone of an insurance contract." *Verex Assurance, Inc. v. John Hanson Savings and Loan, Inc.*, 816 F.2d 1296, 1302 (9th Cir. 1987). The materiality of a misrepresentation is usually a question of fact. *Olson v. Bankers Life Ins. Co.*, 63 Wash.2d 547, 552, 388 P.2d 136 (1964). However, "when an insurer asks no information in regard to a certain matter, it is a fair assumption that it regards the matter as immaterial." *Uslife Credit Life Ins. Co. v. McAfee*, 29 Wash.App. 574, 577, 630 P.2d 450 (1981). This implies that when an insurer specifically asks information in regard to a certain matter, the presumption is that the matter is material. Non–Washington cases have concluded that, in issuing D & O

insurance, the insured's financial statements are material to the insurer's decision to issue coverage. *See National Union Fire Ins. Co. v. Sahlen*, 999 F.2d 1532, 1536 (11th Cir.1993) (noting that financial statements were specifically required as part of the application, which bolstered the conclusion that they were material), *Jaunich v. Nat'l Union Fire Ins. Co.*, 647 F.Supp. 209, 211 (N.D.Cal. 1986) (holding that "the financial health of a company as well as the existence of circumstances that can lead to litigation are material to an insurer's decision to issue a D & O liability policy"), *Shapiro v. Am. Home Assurance Co.*, 584 F.Supp. 1245, 1249 (D.Mass.1984) (same).

■ The undisputed facts in this case support Genesis' contention that C & B's Annual Report, CPA letter, SEC filings were material to Genesis' decision to issue C & B's D & O coverage. The renewal application stated that "[t]he insurer will have relied upon this application and attachments in issuing any policy." (Appendix, Ex. A). The Policy similarly stated that the statements in the application and attached materials "shall be deemed material to the acceptance of the risk or hazard assumed by [Genesis] under this Policy." (Appendix, Ex. B, Section VIII.C). Van stated that the information contained in these documents was materially important to the decision to issue the 2001/2002 Policy because they were the primary source of information regarding C & B's management and financial condition. (Van Dec., ¶ 6). Similarly, she stated that C & B's CPA letter and public filings regarding C & B's internal controls were important in the decision to renew C & B's policy because this information bears on the possibility of fraud involving management. C & B does not put forth any contrary evidence that such information was not material.

Likewise, C & B's representations during the May 24 meeting were material to the decision to issue the 2001/2002 Policy. Van stated that C & B's revenue recognition and right of return policies are important in gauging the financial condition of a company such as C & B that earns revenue primarily by selling merchandise. For this reason, she specifically asked about these issues in the May 24 meeting. (*Id.*, ¶ 7). Again, C & B does not appear to contest these facts.

Lowber's statements in the first of the August 1 conference calls were material to the decision to issue the 2002/2003 Policy extension. They were made in the context of Conley discussing the recently discovered D/Ts, the reasons C & B had engaged in the D/Ts, and how the D/Ts would affect revenue for 2000 and 2001. Thus, Lowber's representations helped to inform Van's understanding of the importance of the D/Ts and why the D/Ts would force C & B to restate its financial statements for 2000 and 2001. This was material information because "[t]he reason for a financial restatement is critical to assessing the risk of the occurrence and severity of any resulting litigation." (Van Dec., ¶ 17). Similarly, Van stated that C & B's representations regarding the D/T product returns, in light of C & B's confirmed limited right of return policy, was material to Van's "understanding of the risk posed by the restatement." (*Id.*, ¶ 18). C & B does not contest that the materiality of this information.

### D. Intent to Deceive

 Whether a misrepresentation is made with an intent to deceive is a question of fact. *Wilburn v. Pioneer Mutual Life Ins. Co.*, 8 Wash.App. 616, 620, 508 P.2d 632 (1973). Nonetheless, in analyzing RCW 48.18.090, the Washington Supreme Court noted that "[w]hen a false statement has been made knowingly, there is a presumption that it was made with intent to

deceive ...." *Music v. United Ins. Co. of Am.*, 59 Wash.2d 765, 769, 370 P.2d 603 (1962). "In the absence of credible evidence that false representations were made *without* [an] intent to deceive, the presumption prevails." *Wilburn*, 8 Wash. App. at 620, 508 P.2d 632 (emphasis in original) (citing *Music*). C & B's intent to deceive may be inferred from 1) various "smoking gun" documents, 2) Lowber's invocation of the Fifth Amendment, and 3) Lowber's guilty plea. However, it may not be inferred from the facts set forth in the SEC's Cease and Desist Order.

### 1. "Smoking Gun" Documents

 In notes that Lowber wrote in June, 2001 (the "Mea Culpa" document), he stated:

> I made a big misstake [sic] in not squelching the dist[ributor] deals in FY00 ... I got away with it, but it also reaffirmed my perennial world view; that you gain nothing by denying problems, & there's never a convenient time to take a hit .... I felt pretty bad at times sitting in audit committee [meetings] accepting kudos for doing a great job with our books while I knew we were sitting on the dist[ributor] debacle ....
>
> . . . . .
>
> No longer have the flexibility to make our [numbers] by managing the fiscal [reporting] process through reserve manipulations or whatever.

(Andreason Dec. 1, Ex. G).

This clearly implies that Lowber knew that the D/Ts were not accounted for properly and that the Audit Committee did not know the truth about the D/Ts. It also implies that he knowingly included false statements in C & B's Annual Report, CPA letter, and SEC filings regarding C & B's revenue recognition and right of return

policies. Likewise, it implies that he knowingly made or allowed misrepresentations in the May 24 meeting and August 1 conference call regarding C & B's revenue recognition and right to return policies. As such, there is a presumption that he made these misrepresentations with an intent to deceive. C & B has not presented any evidence to rebut this presumption.

### 2. Invocation of Fifth Amendment Privilege

■ In a civil proceeding, the court may draw an negative inference from a party's invocation of his Fifth Amendment privilege in refusing to answer a question, so long as there is independent evidence of the fact to be inferred. *Doe by & through Rudy–Glanzer v. Glanzer,* 232 F.3d 1258, 1264 (9th Cir.2000), *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir.1998).

Lowber invoked his right to silence in response to questions about his intent to conceal the true nature of the D/Ts, his knowledge that the 2001 financial statements were inaccurate, his knowledge that the additional required application materials for the 2001/2002 renewal application contained falsities, and his intent to deceive Genesis in the 2001/2002 underwriting process. (Andreason Dec. 1, Ex. N). Because the Mea Culpa document is independent evidence of Lowber's intent to deceive, his invocation of the Fifth Amendment privilege can be used to infer that he knowingly included false statements in C & B's Annual Report, CPA letter, and SEC filings.

Marks also invoked his right to silence in response to questions about whether he knew that C & B misrepresented its right of return policy to the SEC and Genesis, and whether he intended to deceive Genesis. (Andreason Dec. 2, Ex. 5). There is independent evidence that Marks knowingly participated in the D/Ts in order to met Wall Street's revenue expectations.

Marks constructed a spreadsheet to track the D/Ts outside of the normal accounting spreadsheets. (Andreason Dec. 1, Ex. BB). C & B's Vice–President of Sales Jimmy McGehee stated that Marks had exerted pressure on him to met top revenue expectations. (Andreason Dec. 2, Ex. 6). Additionally, Marks received two memorandums in 1999 regarding the practice of early shipping and the problems it created (these were the precursors to the D/Ts). This evidence implies that Marks knew of the D/Ts and knew that they were not properly accounted for and not in keeping with C & B's stated revenue recognition and right of return policies.

### 3. Lowber's Guilty Plea

In pleading guilty to wire fraud, Lowber admitted that he knew that the D/Ts were part of a fraudulent accounting scheme, which included submitting SEC filings that contained false information. (Andreason Dec. 1, Ex. I). Under *Music,* this creates a presumption that Lowber's misrepresentations in these documents were made with an intent to deceive. C & B does not dispute rebut this presumption. Instead, C & B argues that an intent to deceive cannot be inferred from a guilty plea unless the plea addressed the specific issue to be inferred. *Nat'l Union Fire Ins. Co. v. Mason, Perrin, Kanovsky,* 765 F.Supp. 15 (D.D.C.1991). Even if this statement of the law is correct, Lowber's guilty plea addresses the specific issue to be inferred. Namely, that Lowber knowingly included false information in C & B's SEC documents and that Lowber knew that the D/Ts had not been properly accounted for given C & B's stated revenue recognition and right of return policies.

### 4. SEC Cease and Desist Order

The SEC Cease and Desist Order cannot be relied upon to show C & B's intent

to deceive because the Order specifically states that C & B agreed to the order "without admitting or denying the findings herein." (Andreason Dec. 1, Ex. B).

In summary, Genesis had the right to rescind the 2001/2002 Policy and 2002/2003 Policy extension based on material misrepresentations made with an intent to deceive in the 2001/2002 application materials, the May 24 meeting, and certain statements in the August 1 conference call.

*III. Waiver of the Right to Rescind*

█ C & B contends that Genesis waived any right to rescind it may have had based on material misrepresentations because it bound coverage, at a substantially higher rate and on less generous terms than earlier policies, after learning enough relevant facts to put Genesis on inquiry notice to investigate further. Genesis counters with two alternative arguments. First, Genesis argues that the waiver doctrine applies only once Genesis had full knowledge of all the facts that would warrant rescission under Washington law. Genesis contends that it had this full knowledge only just before it rescinded. Second, Genesis argues that it did conduct an investigation by conditioning, in its August 14 letter to C & B, the extension of the 2002/2003 Policy upon C & B providing Genesis with more information about the accounting irregularities and its investigation.

█ Washington law is clear that an insurer will be deemed to have waived its right to rescind an insurance policy only when the insurer "voluntarily and intentionally relinquishe[s] a known right or that [its] conduct warrants an inference of the relinquishment of such a right." *Saunders v. Lloyd's of London*, 113 Wash.2d 330, 339, 779 P.2d 249 (1989). An insurer voluntarily and intentionally relinquishes a known right only if the insurer

has "full knowledge of all the facts" warranting rescission. *Buchanan v. Switzerland*, 76 Wash.2d 100, 108, 455 P.2d 344 (1969). Based on the Washington law governing rescission, an insurer is deemed to have waived its right to rescind only when it has full knowledge that the insured made a material misrepresentation with an intent to deceive.

The parties disagree as to what degree of knowledge satisfies the "full knowledge" requirement. C & B argues that constructive knowledge is sufficient. Genesis argues that actual knowledge is required. The Court concludes, however, that this distinction is not legally relevant given the particular facts in this case in light of Washington's law governing rescission. As the facts below indicate, Genesis cannot arguably be said to have had actual or constructive knowledge that C & B's material misrepresentations were made with an intent to deceive until August 12, at which point Genesis began an "investigation" into the facts upon which it could justifiably rescind the policy.

As a threshold matter, the parties dispute what date Genesis bound coverage for the 2002/2003 Policy. On August 8, 2002, Genesis sent a letter to C & B stating "this letter confirms our agreement to bind Directors and officers Liability extending our current coverage .... A complete binder letter, with attached specimen forms, will be provided to you as soon as practicable." (Andreason Dec. 1, Ex. V). On August 14, Genesis sent a second letter to C & B stating "we are agreeable to extending the expiration date of the above referenced Policy through Genesis [ ] to August 8, 2003." (Appendix D). Genesis contends that it bound coverage on August 8. C & B contends that Genesis bound coverage on August 14. Regardless of when Genesis bound coverage, Genesis had the right to rescind the moment it learned that C & B made material misrepresentations with the

intent to deceive. If Genesis did not rescind promptly, then it will be deemed to have waived its right to do so. This is true whether it learned this after the policy was bound or before.

The parties do not appear to dispute the information that C & B conveyed to Genesis and when. Rather, the parties dispute the significance of this information. This is matter of law, not fact. The legal question is: does the information that Genesis knew as of August 1, August 7, and August 14 respectively constitute knowledge that C & B made material misrepresentations with the intent to deceive?

In the first August 1 conference call, Van learned that Conley had just discovered the D/Ts and the return of the goods involved in those transactions. Van was told that the D/Ts were problematic because the revenue was recognized in 2000, but should not have been because the products were returned in 2001. She stated that it "looked like a flip-flop of revenues." (Van Dep. at 115). She understood that C & B was using the D/Ts to accomplish just-in-time delivery. (*Id.* at 143). Based on this flip-flop, she knew that C & B would likely restate its financial statements for 2000 and 2001. (*Id.* at 169). She also understood that, because Conley had only just discovered the D/T transactions, "everyone had been looking at everything. They hadn't finished yet, but so far it looked like it was just the revenue." (*Id.* at 115). She knew that the auditors were not finished looking at the books, and that the situation was very fluid. (*Id.* at 124). She also learned that a C & B audit committee had become involved. She specifically asked about the rights of return. Lowber told her that even though C & B had not found the contracts for those deals yet, that there could not have been rights of return because otherwise he would not have accounted for the deals as revenue. (*Id.* at

129). She was also told that Lowber had decided to retire before the D/T problem had been discovered. (*Id.* at 116). This information cannot be said to provide even constructive notice that C & B had made material misrepresentations with an intent to deceive during the 2000/2001 underwriting process. Van had no reason to question Lowber's veracity or intentions in making representations regarding the D/Ts. While C & B argues that Genesis knew at that point that it could not rely on the financial statements for 2000 and 2001, this information does not indicate intentional malfeasance by C & B's officers. Absent Genesis having notice that C & B intended to deceive Genesis, it did not yet have a right to rescind. Thus, it could not have waived that right based on the information it learned in the August 1 conference calls.

On August 1 after the conference calls, Van sent a notice to C & B indicating the terms for the renewal policy. (Gangnes dec., Ex J., Sub–Ex. 3). Genesis changed the terms of the policy to increase the premium threefold and to increase the deductible for securities claims. C & B argues that this shows that Genesis knew enough facts to have allowed Genesis to rescind. However, the evidence does not conclusively show this. Van admitted that the terms were changed, in part, because of the increased risk of shareholder suits. (Van Dep, at 156, 170). However, she thought that if such suits were filed, they would be "defensible" because the restatements were "old news." (*Id.* at 170). This implies that there was a qualitative difference in Van's mind about the nature of the increased risk; Van understood it to be relatively minor and "defensible" because there was no indication of intentional malfeasance. Additionally, she stated that the change in terms was also due to market conditions for D & O insurance generally. (*Id.* at 156–57). This evidence does not necessarily infer that she had the full

knowledge that C & B had made material misrepresentations with the intent to deceive.

On August 7, Conley sent a letter to Genesis notifying it of circumstances that could potentially give rise to a claim against C & B. (Appendix, Ex. C). The following statements in the August 7 letter are relevant to this analysis:

The Distributor shipments were intended to improve the Company's Corporate sales by using regional distributors in strategic parts of the country to service the ad-specialty industry, which generally required "on-demand" order fulfillment. . . . The Company recorded all of the shipments as sales (revenue) in the Company's Corporate sales channel for the period ended April 30, 2000. The initial checks showed the Distributors were not creditworthy.

. . . . .

On April 30, 2001, most of the remaining, unsold inventory [from the Distributors] was returned to the Company . . . . When the Distributors returned the inventory to the Company, the original sales were reversed. . . . When returned, the inventory was allocated to several accounts, rather than the Corporate account from which it had been sold.

. . . . .

The above identified circumstances and additional information developed to date, suggest that sales to these Distributors (i) should not have been booked as sales since the Distributors were not creditworthy, and (ii) may have been consignment sales and may have been more properly accounted for as such. As a result, the Company will restate its financial statements for [fiscal years 2000 and 2001] to negate the above transactions. The Company's investigation is

continuing and may result in additional impacts currently unknown that relate or are associated with these and similar transactions . . . .

. . . . .

Potential claims may include those by sellers, purchasers . . . of securities of the Company.

. . . . .

The Company will restate its past financial statements.

(Id.)

This letter's characterization of the D/Ts did not indicate or refer to any intentional malfeasance by any officers within C & B. Notably, the paragraph stating that the returned inventory was allocated to several accounts does not indicate that there was intentional wrongdoing involved or that this necessarily contravened proper accounting methods. As a general matter, restating financial statements does not necessarily mean that the original financial statements contained inaccuracies that were done intentionally. Nothing in this letter indicates that the misrepresentations in the original financial statements were done with an intent to deceive. Lacking evidence of an intent to deceive, it would have been premature for Genesis to have rescinded at this point in time. While the letter indicated that C & B was continuing its investigation, such a statement cannot be deemed to constitute knowledge that C & B's financial condition was in worse shape than revealed by the letter and August 1 conference calls. Moreover, this was a representation by C & B upon which Genesis was entitled to rely. While hindsight shows that the D/Ts and the accounting of the returned inventory did involve intentional malfeasance, Genesis cannot be deemed to have known this as of August 7.[7]

---

7. Whether C & B knew more information than it included in this letter is irrelevant in

the waiver analysis. The waiver analysis is

On August 9, Martin Hacala, an attorney with Genesis, emailed Shaver about the August 7 Letter. He stated "[b]y way of background, we knew this was coming and knew the restatement was happening. (Because it is just moving dollars from one year to another and will have no ongoing impact and because the company is pretty small, I am hoping the restatement will elicit a sign from the market.)" (Gangnes Dec, Ex. S). Again, this only confirms that Genesis knew that C & B was planning to restate its financial statements. Contrary to C & B's contention, it does not indicate that Genesis knew the full extent of the reasons why C & B would restate its financial statements. In fact, it suggests that Genesis believed that the D/Ts were merely a matter of "moving dollars from one year to another," not that Genesis knew or should have known that the D/Ts were part of an intentional scheme to circumvent normal accounting procedures. It is disingenuous for C & B to argue that Genesis knew or should have known by this point that the D/Ts were part of an intentional scheme to circumvent normal accounting procedures when it later argues that Conley did not know that this fact until August 10 or 11. (Gangnes Dec., Ex. I at 39–43).

On August 12, C & B issued a press release. Genesis reviewed the contents of the press release before August 14. (Gangnes Dec., Ex. N, Admission 8–9). The relevant portions of the press release stated:

> The business transactions at issue were not disclosed to the Company's then outside members of its Board of Directors and were not discussed with the Company's auditors. Rather, there is evidence that the Company's standard accounting practices and controls were circumvented and that sales returns in fiscal 2001 were intentionally mis-allocated to sev-

eral of the Company's business lines instead of the business line under which those sales were originally booked. The Committee believes that some members of the Company's former management may have received increased incentive compensation as a result of the overstated FY 2000 financial result.

> \* \* \* \* \*

> The managers responsible for these business decisions and those who were responsible for the integrity of the Company's financial statement no longer have any role with the Company. They include [Jones], [Marks], [and Lowber] . . . .

> \* \* \* \* \*

> Due to the discovery of the accounting irregularities, the Company's auditor, Ernst & Yong, believes there is a material weakness in the Company's internal controls and operations.

(Appendix, Ex. D).

This is the first information that conveyed to Genesis that the D/Ts were part of an intentional scheme to circumvent accounting procedures. Therefore, as of August 14, Genesis knew the facts that would have allowed it to rescind. Genesis admits that the August 12 press release conveyed different information than was conveyed during the August 1 conference calls. (Van Dep. at 190–92). Van admitted that she had some "questions" about this difference in information. (*Id.*)

However, Genesis points out that in its August 14 letter it agreed to extend the Policy for one year (until August 8, 2003) subject to:

> Satisfactory receipt and review of a completed ... Renewal Application, and all information and documentation requested therein, including:

focused on what Genesis knew and when; not what C & B knew and when.

- 2002 Annual Report
- Latest CPA letter to management on internal controls and management's written responses thereto
- All correspondence between the company's auditor and the company's Audit Committee regarding accounting irregularities, remedying internal controls and investigation.

(Appendix, Ex. E). By conditioning the extension of the 2001/2002 Policy upon receipt and review of information, Genesis claims that it essentially began conducting an investigation. The investigation consisted of requesting that C & B provide it with additional information that was under the control of C & B (its correspondence with its auditors). While this may be a rather passive investigation, it is nonetheless an investigation.[8] Thus, even though Genesis admits that it did not conduct its own independent investigation at this point, (Shaver Dep. at 35), the August 14 letter requiring submission of additional information was Genesis' "vehicle for seeking information." (*Id.* at 110). Similarly, Van stated that the contingency clause was included in the August 14 letter precisely because she had questions about the difference between the August 1 information and the August 12 press release information. (Van Dep. at 191).

▪ At the least, the August 14 letter indicates that Genesis had no intention to relinquish its right to rescind based upon the information it knew to date. C & B's position seems to be that by not immediately rescinding at this point, Genesis waived its right to do so later. This is untenable. When an insurer learns of facts that would warrant rescission, it must be allowed the ability to investigate

to determine if those facts are accurate and if rescission is truly warranted. "[P]ublic policy supports the allowance of such a reasonable investigation; it would be unwise to give insurers an economic incentive to rescind insurance at the drop of a hat and without sufficient investigation. Such willy-nilly actions would obviously result in less insurance coverage ...." *Chicago Ins. Co. v. Kreitzer & Vogelman*, 265 F.Supp.2d 335, 344 (S.D.N.Y. 2003).

▪ On August 21, C & B paid the premium payment for the extended 2002/2003 Policy to Genesis. Genesis cashed the payment sometime thereafter. While the parties dispute the legal and factual relevance this fact, the Court concludes that Genesis cannot be deemed to have waived its right to rescind by accepting the premium when it was still in the process of investigating the facts that could possibly warrant rescission. Merely accepting the premium check does not convert Genesis investigation into a waiver.

In September, October, and November, three shareholder suits were filed, which C & B tendered to Genesis. In late September or early October, Genesis prepared a "New Claim Memo" that stated "the press release intimated that the Company's former management ... had intentionally circumvented the Company's standard accounting practices and controls in order to conceal the improper revenue recognition." (Gangnes Dec., Ex. T). In mid-October, Genesis hired outside legal counsel to protect its interest in C & B's claims and to investigate such claims. On October 16, Genesis' counsel requested that C & B's counsel send copies of all documents in the

---

**8.** It must be said that both parties seem to have consistently performed their respective obligations late and last minute. By early September, C & B had provided only the original application and the Annual Report. It had not provided the other required materials. On September 11, a Genesis representative sent an email to one of C & B's insurance brokers requesting that C & B submit this material. (Andreason Dec. 1, Ex. Y).

shareholder litigation and all documents produced to the SEC. Sometime after this, Genesis obtained key documents detailing the accounting scheme and improprieties, including documents indicating that Lowber had knowingly and intentionally participated in the scheme. On December 6, Genesis sent C & B a notice of rescission. (Appendix F).

Again, the parties do not dispute the facts about what occurred between August 14 and December 6. Rather, they dispute the legal significance that should attach to these facts. Because Genesis was conducting an investigation by conditioning the extension of the Policy upon receipt and review of information that was under C & B's control, Genesis was in the process of conducting that investigation when the shareholder suit claims were filed. It had full knowledge that C & B had made material misrepresentations with an intent to deceive only when it obtained the key documents in late October or early November. Because it rescinded shortly thereafter, it did not waive its right to rescind.

## IV. Severability of Application Provision

 The parties dispute the interpretation of a "severability of application" provision within the insurance contract. C & B proposes an interpretation whereby even if Lowber knowingly included misrepresentations in the application, D & O coverage is void only as to him (and any other directors or officers who knew of the misrepresentations), but not as to innocent directors or officers or to the C & B entity as a whole because his knowledge cannot be imputed to otherwise innocent directors or officers. As such, Genesis had no right to rescind the coverage for innocent directors or officers and the C & B entity as a whole. In contrast, Genesis proposes an interpretation whereby Lowber's knowledge that the renewal application included material misrepresentations made with an intent to deceive is imputed to all the

otherwise innocent directors or officers. Therefore, coverage was rightly voided as to all directors or officers and to the C & B entity as a whole.

The severability of application provision reads:

> [I]n the event that the Application, including materials submitted therewith, contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the INSURER under this Policy, this Policy in its entirety shall be void and of no effect whatsoever; and provided, however, that no knowledge possessed by any DIRECTOR or OFFICER shall be imputed to any other DIRECTOR or OFFICER except for material information known to the person or persons who signed the Application. In the event that any of the particulars or statements in the Application is untrue, this Policy will be voided with respect to any DIRECTOR or OFFICER who knew of such untruth.

(Andreason Dec. 1, Ex. A at GUW0042).

 Interpretation of an insurance contract is a matter of law. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1429 (9th Cir.1995) (interpreting Washington law). The purpose of contract interpretation is to give effect to the parties' intentions. *Berg v. Hudesman*, 115 Wash.2d 657, 801 P.2d 222 (1990). The following principles of contract interpretation are relevant to the analysis of this particular contract provision. A contract must be interpreted as a whole such that every term in the contract is given effect and force. *Boeing Co. v. Aetna Casualty & Surety Co.*, 113 Wash.2d 869, 876, 784 P.2d 507 (1990). Interpretations that contradict and thereby nullify clauses within the contract are disfavored. *Stouffer v. Knight &*

*Cont'l Cas. Co.,* 96 Wa.App. 741, 750, 982 P.2d 105 (1999). Likewise, interpretations that would result in a term being superfluous or duplicative are disfavored. *Am. Agency Life Ins. Co. v. Russell,* 37 Wash. App. 110, 114, 678 P.2d 1303 (1984). When language is unambiguous, courts may not interpret the contract in such a way to create an ambiguity where none exists. *Callahan v. State Farm Life Ins. Co.,* 82 Wash.App. 807, 808, 920 P.2d 205 (1996). However, when the language is ambiguous, the ambiguity must be construed against the insurer, especially where the language concerns exclusions limiting coverage. *Findlay v. United Pac. Ins. Co.,* 129 Wash.2d 368, 374, 917 P.2d 116 (1996). Contract language is ambiguous if it is "fairly susceptible to more than one reasonable interpretation." *Mendoza v. Rivera–Chavez,* 88 Wash.App. 261, 268, 945 P.2d 232 (1997).

▮▮▮▮▮ Additionally, a court should apply the context rule to aid in interpreting a contract, regardless of whether the contract is ambiguous or not. *Berg,* 115 Wash.2d at 669, 801 P.2d 222. Extrinsic evidence is admissible to show this context. *Id.* at 667, 801 P.2d 222. However, such evidence is admissible solely to aid in the interpretation of what is already contained in the contract. It is not admissible to modify or contradict the terms of an otherwise unambiguous contract. *Id.* at 669, 801 P.2d 222. Moreover, only evidence of the parties' objective manifestation of their intent is admissible; evidence of their subjective intent not otherwise manifested is inadmissible. *Wells Trust v. Grand Central Sauna & Hot Tub Co.,* 62 Wash.App. 593, 602, 815 P.2d 284 (1991).

Here, the contract language itself is unambiguous when the severability of application provision is read in its entirety rather than reading sentences or clauses in isolation. The first clause of the first sentence provides that the Policy will be void in its entirety if the application or materials submitted with the application contain misrepresentations made with an intent to deceive. The second clause of this sentence together with the second sentence limit when the Policy may be deemed void in its entirety. The second sentence preserves coverage for directors or officers who had no knowledge of the misrepresentations within the application materials. However, the universe of those who are deemed to have such knowledge is established by the second clause of the first sentence. That clause indicates that a director's or officer's knowledge of a misrepresentation made with an intent to deceive is not imputed to other directors or officers unless the application's signor knew of the misrepresentation. This clearly implies that when the signor knows that there are misrepresentations in the application materials, that knowledge is imputed to all other directors or officers. The result is that innocent directors or officers retain coverage unless the application's signor knows of a misrepresentation within the application, in which case even innocent directors and officers lose coverage.

In contrast, C & B's proposed interpretation would render the second clause of the first sentence meaningless. Under C & B's proposed interpretation, the Policy can be voided for individual directors and officers only if they knew of the misrepresentation within the application materials. The signor's knowledge can never be imputed to other directors and officers. C & B's proposed interpretation would negate the clear language of the second clause of the first sentence. A court cannot interpret a contract such that the contract's terms contradiction each other or render each other null. Even if the second sentence is redundant under Genesis' interpretation, given the choice between an interpretation that results in a contradiction and nullity versus redundancy, the latter is

the preferable result. While an interpretation that results in a duplicative term is disfavored, such a result does not necessarily violate the principle that each term in the contract be given full effect and force. C & B's proposed interpretation would violate that principle. Because C & B's interpretation would render the plain language of this clause null, it is not a reasonable interpretation. Because there is only one reasonable interpretation, this provision of the contract is not ambiguous.

Nonetheless, under the context rule, the court should look at extrinsic evidence to aid in interpreting this provision. In August, 2001 C & B's insurance broker requested that the 2001/2002 Policy include a severability of application provision in the contract. The standard policy had included a provision that read:

> except for material facts or circumstances known to the person(s) who signed the Application, any misstatement or omission in such Application or materials submitted therewith ... shall not be imputed to any other DIRECTOR or OFFICER for purposes of determining the validity of this Policy as to such other DIRECTOR or OFFICER.

(Gangnes Dec., Ex. J, Sub–Ex. 15). C & B's broker requested that the policy "Provide Severability to the Application." (Gangnes Dec., Ex. J, Sub–Ex. 14). He did not suggest specific language, nor did he elaborate on what he meant by "Severability to the Application." In response, Van proposed the language in the second clause of the first sentence and the second sentence, both of which were eventually included in the Policy. C & B's broker did not counter with contrary or modified language.

Van stated in her deposition that she understood that C & B's broker was requesting something "broader" for C & B and "narrower" for Genesis than the standard base policy offered. (Van. Dep. at 90–95). When asked about the effect of her proposed provision on innocent directors or officers when the application signor knew of material misrepresentations in the application, she first stated that Genesis could not rescind coverage as to those innocent directors or officers. (*Id.* at 98–99). She later stated that in such a situation, the Policy would be void as to otherwise innocent directors or officers because the signor's knowledge would be imputed to them. (*Id.* at 195–97). She made this later statement because she wanted to correct her first statement. Nonetheless, she admits that the proposed provision is not different from the standard base provision in that the signor's knowledge is imputed to innocent directors or officers under both versions. (*Id.* at 97–98). When asked if she had explained to C & B's broker that, in her proposed provision, the signor's knowledge would be imputed to innocent directors or officers, she stated that she did not because the broker had dealt with Genesis and their policy provisions before and she did not feel that she needed to educate him further. (*Id.*)

This evidence does not show what C & B specifically intended in seeking a severability of application provision. There is no evidence in the record of any communication between the parties that would indicate a specific intent in including this provision. C & B's insurance broker Paul Nowak testified in deposition that severability was a term used in the industry to separate coverage for "white hats and dark hats. While hats being people who may not have been involved in certain activities, and then dark hats being people who were being alleged of being involved with some wrongdoing and possibly ... not getting coverage." (Gangnes Dec., Ex. G at 193–94). However, he did not testify that he intended to prevent the signor's knowledge

from being imputed to other directors and officers. "White hats" are covered when the signor does not know of material misrepresentations in the application materials. Moreover, even though Van stated that she understood that C & B wanted something broader than the standard base policy, she did not specify what this was. While the revised provision may not differ in effect from the original provision, and while C & B may have subjectively intended the provision to be different than how it currently reads, there is no evidence to support C & B's proposed interpretation. C & B has not presented any objective manifestation evidence of its supposed intent to preclude imputing the signor's knowledge to other directors or officers.

Moreover, Van's proposed provision does arguably add something that was not included in the standard base policy, or at least clarifies something that was ambiguous in that policy. Namely, that coverage is preserved for individual directors or officers when they have no knowledge of the misrepresentations. While the signor's knowledge is imputed to other directors or officers in both versions, the standard policy did not make it explicit that coverage would be preserved for individual directors or officers when neither they nor the signor knew of the misrepresentations.

In the end, while C & B cites various principles and inconclusive facts which favor its interpretation, its proposed interpretation cannot be adopted without nullifying the clear and plain language of the first sentence of the provision. Therefore, the Court interprets the provision to mean that the signor's knowledge of a misrepresentation in the application materials is imputed to otherwise innocent directors or officers. Consequently, the policy is void as to all directors or officers when the signor knows of a misrepresentation in the application materials.

The evidence here indicates that Lowber knew that the financial statements that were attached or submitted with the application contained false statements. Because Lowber signed the policy renewal application, his knowledge is imputed to the otherwise innocent directors and officers. As such, Genesis had a right to rescind the policy as to all directors and officers.

### 1. Rescission As To the C & B Entity As a Whole

■■■ C & B argues that Genesis should not have rescinded the D & O coverage as to the C & B entity as a whole. However, based on the above interpretation of the severability of application provision, the first clause of the first sentence clearly states that the policy is void in its entirety when the application materials contain material misrepresentations made with an intent to deceive. The following clause and sentence address only imputation of knowledge to individual directors or officers and their corresponding individual coverage. These clauses do not address coverage for the C & B entity as whole. Therefore, the first clause governs when the policy is void as to the C & B entity as a whole. Because the renewal application contained material misrepresentations made with an intent to deceive, Genesis rightfully rescinded C & B's entity coverage.

### V. Breach of Duty of Good Faith and Fair Dealing

C & B argues that Genesis breached its duty of good faith by 1) not concluding that it (Genesis) had waived its right to rescind, or ratified the Policy extension, based on the August 1, 7, and 12 disclosures, 2) not reviewing the severability of application provision and concluding that it prohibited Genesis from rescinding coverage as to individual directors and officers,

3) not conducting an investigation as to whether each individual director and officer made material misrepresentations with an intent to deceive as required by the severability of application provision (as C & B interprets it), 4) not conducting a more thorough investigation of the facts that gave rise to its decision to rescind, particularly that Genesis should not have relied on documents alone, but should also have interviewed C & B directors, officers, and employees, 5) not considering and citing C & B's August 7 and 12 disclosures in Genesis' rescission letter, and 6) not including a written record supporting Genesis' decision to rescind in the claim file.

C & B's argument in this breach of the duty of good faith and fair dealing motion highlights the odd and untenable position it takes in this litigation. In this motion, it argues that Genesis should have conducted a more thorough investigation prior to rescinding the policy. At the same time, it argues in the rescission and breach of contract motions that Genesis should have rescinded immediately after the August 12 press release before it had an opportunity to conduct an investigation because it should have known by then that it had a right to rescind.

The first and second arguments both rest on the premise that Genesis should have reached a different legal conclusion than it reached and its failure to do so constitutes bad faith. Given the Court's holding that Genesis did not waive its right to rescind based on C & B's August 1, 7, and 12 disclosures, C & B's argument necessarily fails. Similarly, given the Court's interpretation of the severability of application provision and holding that the provision did not prohibit Genesis from voiding the coverage as to all directors and officers based on imputing Lowber's knowledge, C & B's argument that Genesis incorrectly applied the provision to void coverage to all directors and officers necessarily fails.

For this same reason, once Genesis learned that Lowber, who signed the renewal application, had made material misrepresentations with an intent to deceive, Genesis need not have conducted individual investigations of the other directors and officers before rescinding the policy for all directors and officers.

C & B's argument that it was bad faith for Genesis not to have considered and cited C & B's August 7 and August 12 disclosures in deciding to rescind the Policy. Genesis' rescission letter specifically referred to the August 12 press release; it did not refer to the August 7 Conley letter. C & B's argument is unpersuasive. As discussed above, that letter did not disclose facts that would have warranted rescission as of August 7. Therefore, there is no reason why the rescission letter necessarily should have referred to the August 7 letter.

Lastly, C & B has not cited any authority that requires a decision to rescind be based on interviews rather than information in documents. Therefore, there is no basis to conclude that Genesis acted in bad faith in rescinding based on documents obtained in later October/early November.

In conclusion, in light of the Court's holding on C & B's rescission motion and Genesis' breach of contract motion, C & B's breach of good faith and fair dealing claims necessarily fail. Therefore, the Court GRANTS Genesis's motion for summary judgment on this issue.

## CONCLUSION

The Court DENIES C & B's Motion for Partial Summary Judgment Regarding Wrongful Rescission and GRANTS Genesis' Motion for Summary Judgment on C & B's Breach of Contract Claim because 1) C & B made material misrepresentations with an intent to deceive in the 2001/2002 and 2002/2003 underwriting processes, 2)

Genesis did not waive its right to rescind, and 3) the severability of application provision in the Policy did not preclude voiding coverage to the C & B entity as whole and to all directors and officers.

The Court GRANTS Genesis' Motion for Summary Judgment on C & B's Breach of Duty of Fair Dealing and Good Faith. Given the Court's holding on C & B's rescission motion and Genesis' breach of contract motion, C & B's argument that Genesis' rescission was in bad faith necessarily fails.

The clerk is directed to provide copies of this order to all counsel of record.